IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNNY C. VALENCIA,

       Plaintiff,

vs.                                            Civil No. 96-0791 M/WWD

KENNETH S. APFEL, Commissioner
of Social Security Administration,

       Defendant.[1]

**MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION**
**Proposed Findings**

    1.  This matter comes before the Court upon plaintiff's Motion to Reverse and Remand an Administrative Agency Decision, filed September 3, 1997 [15-1]. The Commissioner denied plaintiff's request for Disability Insurance benefits and Supplemental Security Income benefits based on disability under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423 and 1381a. Plaintiff is 41 years old and alleges a disability since February 9, 1990, due to a herniated disk and a cracked back bone.

    2.  After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") likewise denied the applications, concluding that Mr. Valencia has the residual functional capacity to do at least light work. The Appeals Council also denied plaintiff's request

---

    [1] President Clinton appointed Kenneth S. Apfel Commissioner of Social Security on August 29, 1997. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel should be substituted, therefore, for Shirley S. Chater, as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

for review of the ALJ's decision, thus the ALJ's decision is the final decision of the Commissioner. Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g). Mr. Valencia has past relevant work as a roughneck on oil rigs, requiring a very heavy physical demand level of work.

3. The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. Id. (citation omitted).

4. Plaintiff raises the following allegations of error with respect to the ALJ's decision: (1) the ALJ's decision is not supported by substantial evidence considering the record as a whole and (2) the ALJ failed in his duty to fully develop the record and explore all the issues.

5. "To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity." Thompson at 1486 (citing 42 U.S.C. § §423 (d)(1)(A)), 1382c(a)(3)(A)). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920. The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled. Id. (citations omitted).

6. The first four steps of the sequential evaluation process are not at issue in this case. At step five, the burden shifts to the Commissioner to show that the claimant has a Residual Functional Capacity ("RFC") to do work in the national economy other than  past relevant work.

Thompson at 1487 (citations omitted).  The Medical-Vocational Guidelines ("grids") are used at this step to determine whether disability exists.  20 C.F.R. Part 404, Subpt. P, App. 2.  The grids reflect the existence of jobs in the national economy at various Residual Functional Capacity ("RFC") levels by incorporating administrative notice of occupational publications and studies.  20 C.F.R. §§404.1566(d); 416.966(d).  This aids the Commissioner in determining what specific job types in the national economy the claimant can perform.  The grids assume that the claimant's sole limitation is lack of strength, i.e., an exertional impairment.  20 C.F.R. Part 404, Subpt. P, App. 2, §2000(e)(2).

      7.  Mr. Valencia was injured on his job as a roughneck in February 1990 and complains of low back pain, with radiating symptoms of pain, tingling and paresthesias.  Tr. at 226-27.  In March 1990, plaintiff was diagnosed by treating physician Dr. Peter Saltzman, with L5-S1 spondylolysis with large disc herniation at the L5-S1 level on his right side.  Tr. at 258.

      8.  Although his initial recommendation was for conservative treatment,[2] Dr. Saltzman eventually performed lumbar spinal surgery (discectomy and fusion) on his patient the following month.  Tr. at 253, 258.  Three months after surgery, plaintiff did not complain of any back or leg pain and was able to ambulate well without difficulty.  He was given a brace to use full-time as well as a Darvocet prescription.  Tr. at 252.  In October 1990, Mr. Valencia was set up for physical therapy to strengthen his back.  He was given anti-inflammatory medications and a corset to replace the brace.  Tr. at 247-251.  By February of 1991 he was directed to use a heating pad

---

[2] Conservative treatment consisted of anti-inflammatory medications, muscle relaxants and physical therapy.

on his back to wean himself off the corset.  As with all the previous follow-ups, plaintiff did not complain of back pain and was feeling "great" in October of 1991.  Tr. at 243.

  9. The physical therapist conducted a Functional Capacity Evaluation in October 1991, Tr. at 243, which placed Mr. Valencia within the "light-medium" physical demand level and concluded that he could perform at this level for an 8-hour day.  The results of the evaluation indicated that although plaintiff's lifting ability was limited, he still could work at a light physical demand level for an 8 hour day.  Tr. at 188.  According to the report, Mr. Valencia could lift between 25-35 pounds occasionally, and sitting, standing and walking could be done on a frequent basis.  Tr. at 184, 188.  Based on the results of this evaluation, Dr. Saltzman concluded that plaintiff could return to work at that time and released plaintiff from his care barring the development of any new problems.

  10. In the beginning of 1992, Mr. Valencia returned to Dr. Saltzman for a series of visits[3] presenting with complaints of intermittent low back pain and muscle cramps in his right lower extremity.  Plaintiff also complained of nocturnal wakening due to the pain as well as an inability to sit for even short periods of time.  Tr. at 298.  An x-ray revealed a healing lumbar fusion, Tr. at 299, but an MRI did not reveal evidence of an obvious recurrent disc herniation.  Tr. at 301.  Dr. Saltzman prescribed plaintiff anti-inflammatory medications and strengthening exercises for the back and legs.  Id.

  11. Another evaluation was conducted, this time in September 1993 by Dr. William Barkman, D.O. at the request of the Social Security Administration.  Tr. at 228-34.  At that time,

---

[3] These visits conflict with the ALJ's statement in his decision that plaintiff "did not see his treating physician between October 1991 and December 1992."  Tr. at 24.

plaintiff was three years post-surgery and was taking Flexeril as needed, Lodine three times a day and Soma tablets for muscle spasm. Dr. Barkman's impressions of Mr. Valencia was that he may have a pseudarthrosis causing some "motion at the fusion site," and suggested to Mr. Valencia that he follow this up with Dr. Saltzman.[4] The doctor noted some tenderness in plaintiff's lower back to palpitation and that there was a limited range of motion in the lower lumbar region of his spine. Dr. Barkman expressed doubt that plaintiff would be able to return to a "heavy lifting type activity" until it was determined that a solid fusion had formed. Tr. at 228.

12. The evaluation results were that Mr. Valencia could lift 25 pounds occasionally, 15 to 20 pounds frequently, stand or walk 3 to 4 hours with interruption but 2 to 3 hours without interruption, and that there were no restrictions as to sitting.

13. The following year, in June 1994, plaintiff again visited Dr. Saltzman, presenting with aching-type pains in his back and right hip, but no radiating pain, tingling or numbness in his lower extremities. Mr. Valencia was diagnosed to have a healed lumbar fusion and lumbosacral sprain and was prescribed massage therapy and Robaxin for muscle spasm. Tr. at 308.

14. The most recent evaluation was conducted in June 1995, at the request of plaintiff and his attorney.[5] In his report, Dr. Lopez noted that plaintiff's continued back and leg pain may be due in part to instability caused by the fusion if it were not intact, and that this issue had been raised. He also noted plaintiff's reported inability to sit for longer than 20 minutes at a time. Tr.

---

[4] Pseudarthrosis is a "pathologic entity characterized by deossification of a weight-bearing long bone. . . leading to existence of the 'false joint' that gives the condition its name." Dorland's Illus. Med. Dict., 26th Ed.

[5] These two most recent reports of Dr. Saltzman and Dr. Lopez were submitted after the hearing to the Appeals Council. Tr. at 5.

at 309. Dr. Lopez opined that functional work capacity would be limited to lifting 10 to 15 pounds frequently and 20 to 25 pounds occasionally and that plaintiff would require frequent position changes from sitting and standing. Dr. Lopez finally concluded that the work-related injuries sustained by plaintiff resulted in "considerable impairment."

**First Alleged Error: Whether decision supported by substantial evidence as a whole**

15. I find that the ALJ based his decision on both functional evaluations (by Dr. Barkman and the physical therapist) in his decision that Mr. Valencia could still perform light work as set out by Luna v. Bowen. Tr. at 23. Evaluation results, even those of Dr. Lopez, were within the range of light work.[6] Given the objective medical evidence from plaintiff's statements to his treating physician and impressions from these visits, Tr. at 23-24, I find that the ALJ's decision was supported by substantial evidence, assuming that plaintiff's complaints of constant, disabling pain are not credible.

16. However, although the ALJ hinted at evidence which could support a finding of noncredibility, he failed to make specific findings as required. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (failure to make credibility findings regarding critical testimony "fatally

---

[6] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling when sitting is involved. SSR 83-10; 20 C.F.R. § 404.1567(b). The regulations fail to describe what constitutes a "good deal" of walking or standing. See SSR 83-10; 20 C.F.R. § 404.1567(b). The record also contains an undated, unsigned evaluation which appears to have been used for workers' compensation purposes. It showed that Mr. Valencia had the ability to lift 5 to 10 pounds frequently, 25 pounds occasionally, and the ability to sit continuously for 1 hour, total for 4 hours in an 8-hour day. Tr. 238-242. However, even this report is consistent with the ALJ's finding that plaintiff has a residual functional capacity for light work.

undermines the [Commissioner's] argument that there is substantial evidence adequate to support his conclusion that claimant is not under a disability") (internal quotations omitted).

17.  A proper credibility analysis requires investigation into all avenues presented that relate to "subjective complaints, including nature, location, onset, duration, frequency, radiation and intensity of pain; aggravating factors, adverse side effects of medications, treatment, other than medication, for relief of pain, functional restrictions; and claimant's daily activities." SSR-88-13; see Luna v. Bowen, 834 F.2d 161, 166 (10th Cir. 1987).

18.  The ALJ pointed to plaintiff's statements to Dr. Saltzman and his functional capacity assessments, but failed to consider pain symptoms other than to state that they were "taken into account" in the evaluations. Tr. at 23. While objective medical evidence is used in determining disability, it is not a substitute for a separate inquiry into plaintiff's symptoms of pain, as symptoms themselves may affect a person's ability to work. 20 C.F.R. § 404.1529(a).[7]

19.  Similarly, the ALJ at the hearing voiced some doubt as to whether plaintiff's pain was severe, Tr. at 343 and noted in his decision that plaintiff had not complained of pain on several visits to Dr. Saltzman, Tr. at 23, but ignored other medical findings. For example, Dr. Barkman noted that plaintiff's pain was a "limitation" on Mr. Valencia's ability to work. Tr. at 226. Plaintiff takes several prescription medications for pain and spasm on at least a daily basis, Tr. at 226, 331-32,[8] and still reports visiting his treating physician twice monthly, Tr. at 337. The ALJ

---

[7] 20 C.F.R. §§ 404.1529, 416.929 reads:  "In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."

[8] Plaintiff felt that the surgery was successful in reducing the pain in his legs by "not even half" but that it did not change the pain level in his back. Tr. at 330.

spent considerable time at the hearing suggesting that plaintiff find a pain expert instead of a surgeon to treat him so that he could manage with less pain, using his own example as a migraine sufferer.  Tr. at 337-341.

20.	Mr. Valencia complains that the pain prevents him from sleeping well, Tr. at 156.  He also complains of side effects from the medications, most notably irritability and drowsiness.  Tr. at 334-35.  In his October 1991 evaluation the physical therapist noted that plaintiff reported taking 3 two-hour naps daily with night sleep "beginning at 9:00 p.m. and sleeping through the entire night."  Tr. at 184.  He drives a car for short periods of time, and visits friends and relatives "once in a while."  Tr. at 75.  He spends most of this time going to physical therapy appointments, watching T.V., listening to the radio and reading.  Id.

21.	These findings may be part of evidence which ultimately supports a finding of noncredibility, but in light of the evidence in the whole record, I cannot say that the present noncredibility determination rests on substantial evidence.  See Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects).

22.	The result of a credibility determination is critical here because an ALJ may rely on the grids when evaluating non-exertional impairment only if plaintiff's testimony is not entirely credible.  Williams v. Bowen, 844 F.2d 748, 755 (10th Cir. 1988).  Otherwise, the grids may be used merely as a framework for a disability determination.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2), cited in Gathright v. Shalala, 872 F.Supp. 893, 897 (D.N.M. 1993).

23. In addition to plaintiff's own statements (Tr. at 80, e.g.), Dr. Lopez' report stated that Mr. Valencia could sit only for short periods at a time. See ¶ 14, above. In this case then, a finding of credibility would also require a vocational consult, as a claimant's inability to sit or stand for prolonged periods of time requires the ALJ to consult a vocational expert before making a determination. See Ragland v. Shalala, 992 F.2d 1056, 1059 (10th Cir. 1993).[9]

**Second Alleged Error - duty to develop record**

24. Plaintiff contends that the ALJ failed in his duty to fully develop the record and explore all the issues. However, I find that the ALJ adequately reviewed and inquired into the relevant areas, including Mr. Valencia's symptoms, use of medications, and past as well as current treatment. Tr. 339-41;[10] 20 C.F.R. §§ 404.1529, 416.929; Carter v. Chater, 73 F.3d 1019, 1021 (10th Cir. 1996) (citing Baca v. Department of Health & Human Servs., 5 F.3d 476, 479-80 (10th Cir.1993)).

25. Plaintiff's counsel contends that during the hearing, the ALJ frequently cut Mr. Valencia off in his efforts to testify about his constant pain and numbness and includes references to such instances in the brief. Mem. at 3-5. I shared plaintiff's impression upon review of the hearing transcript. Under these circumstances, the necessity for the ALJ to perform a credibility

---

[9] As I've mentioned above, see ¶ 16, Dr. Lopez' report does not necessarily conflict with the ALJ's residual functional capacity findings. However, I note that Dr. Lopez couches his report results in terms of "impairment" for disability benefit purposes, a determination which is left solely to the Commissioner, not to any physician. See 20 C.F.R. § 404.1527(e)(1). Also, my recommendation for remand in this case is not based on the existence of Dr. Lopez' report as new or additional evidence. See O'Dell v. Shalala, 44 F.3d, 855, 858 (10th Cir. 1994). However, because no inquiry has been done with the evidence available in the record at the time of the hearing, this report should be considered upon remand.

[10] In fact, there was considerable discussion about Mr. Valencia's symptoms and whether he would get better relief with a specialist who was not a surgeon. Tr. at 340.

inquiry is even more critical. However, plaintiff's contentions about the ALJ's interruptions when plaintiff was trying to point out his two-time failure on the GED are pointless. Even if plaintiff *were* illiterate, he would still be considered nondisabled in a disability determination which was based on the grids. See 20 C.F.R. Pt.404,Subpt.P., App.2 Table No. 2, Rule 202.16.[11]

26. In sum, (1) the ALJ's decision is not supported by substantial evidence considering the record as a whole in that the ALJ did not conduct a proper credibility analysis and (2) the ALJ did not fail in his duty to fully develop the record and explore all the issues.

## Recommendation

I recommend that plaintiff's Motion to Reverse and Remand an Administrative Agency Decision [15-1] be granted for the purpose of conducting a proper credibility analysis as set out by Luna v. Bowen. If, on remand, a finding of credibility results, the ALJ is to conduct a Step Five inquiry, obtaining a vocational consult if plaintiff's nonexertional impairment is found to be significantly limiting to his ability to perform work.

_____
UNITED STATES MAGISTRATE JUDGE

---

[11] This assumes the ALJ was not in error relying on the grids to determine disability, a determination that remains undecided until a correct credibility inquiry is made. Also, plaintiff seems to be under the impression that someone who fails the GED twice, *a fortiori*, also cannot read, write or understand English.